Filed 5/21/26  Garcia v. John Hancock Life Ins. Co. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MYRA GARCIA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>    Defendant and Respondent. | B340684<br><br>(Los Angeles County Super. Ct. No. 20STCV32997) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Affirmed in part and reversed in part.

Atticus Injury Law and Atticus N. Wegman for Plaintiff and Appellant.

Haight Brown & Bonesteel, Bruce Cleeland, Gary LaHendro, Allison Harvey and Yury A. Kolesnikov for Defendant and Respondent.

_____

Myra Garcia tripped and fell when attempting to board an elevator in a commercial building owned by John Hancock Life Insurance Company (John Hancock).  Garcia sued John Hancock, alleging the elevator car was not level with the lobby floor and John Hancock was responsible for this dangerous condition.  She appeals after the trial court granted John Hancock's motion for summary adjudication on her cause of action for violation of the Disabled Persons Act (Civ. Code, § 54 et seq.) and subsequent motion for summary judgment on her claims for premises liability and negligence.  We affirm the order granting summary adjudication on the Disabled Persons Act claim.  Because there is a triable issue whether John Hancock created and thus had notice of the alleged dangerous condition, however, we reverse the order granting summary judgment and remand for further proceedings on Garcia's premises liability and negligence claims.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *The Trip and Fall*

Garcia worked on the 17th floor of an office building in downtown Los Angeles that John Hancock owned and managed.  Between 2014 and 2020, Garcia used the building's elevators "hundreds of times" and took Elevator No. 8 at least 25 to 50 times without incident.

In March 2020, Garcia was 62 years old.  She had asthma and diabetes but did not use or need any assistive equipment to walk.

On March 9, Garcia followed her normal morning commute.  She drove her car to a park and ride, took a bus to downtown Los Angeles, and then walked about a block and a half to the entrance of the building.  Garcia felt "some mild fatigue" after the walk.  Upon entering the building, however, Garcia walked normally across the lobby to a bank of elevators.  She held a

2

roller bag in her left hand, a handbag on her right shoulder, and possibly a cell phone in her right hand.

When the doors of Elevator No. 8 were not fully open but were open just enough for her to walk through, Garcia began to enter the elevator, tripped, and fell to the floor. As a result of the fall, Garcia broke her left leg.

Garcia believed her right foot got "caught" or "stuck" on something in the threshold between the elevator floor and the lobby floor because when she looked back, she did not see anything in her path that would have caused her to fall. Garcia never saw a height differential between the elevator floor and the lobby floor but assumed there was a differential of two inches at the time of her fall based on what she "felt" with her foot.

Building security personnel arrived immediately after Garcia fell and did not notice a height differential between the elevator floor and lobby floor once the elevator doors were in a fully open position. The elevator was placed out of service. Three days after the incident, the City of Los Angeles Department of Building and Safety (City) inspected the elevator. The City concluded the elevator's safety features were in compliance with all governing legal standards and permitted it to resume normal service. Mechanic James Clark from Otis Elevator Company (Otis), the elevator maintenance company for the building, then conducted his own inspection. He found the height differential between the elevator floor and the lobby floor when the elevator doors started to open to be four and 1/2 inches but only 1/8 inch when the elevator came to a stop with its doors fully open.

B.    *The Lawsuit*

Garcia filed her lawsuit in August 2020. In her second amended complaint, she alleged causes of action against John

Hancock and Otis for products liability, premises liability, negligence, and, as to John Hancock alone, violation of the Disabled Persons Act. She alleged that, as a common carrier, John Hancock had a heightened duty of care that it breached by not protecting her from "a dangerous and unstable" elevator. As for her disability discrimination claim, Garcia alleged she suffered from asthma and diabetes and that John Hancock denied her "full and equal access to public accommodations due to her disability." She alleged the "mislevel[ed]" elevator was not in compliance with standards of the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.) and the California Building Standards Code (Cal. Code. Regs., tit. 24). She requested damages and attorney's fees.[1]

C.     *Motion for Summary Adjudication on Disabled Persons Act Claim*

In August 2022, John Hancock moved for summary adjudication on Garcia's disability discrimination claim.[2] John Hancock argued Garcia did not have standing to pursue damages under the Disabled Persons Act because she was not denied equal access to the building. Further, John Hancock noted that to access her office Garcia could have taken other elevators besides

---

[1]     Garcia's employer's workers' compensation insurer, American Casualty Company of Reading, Pennsylvania, intervened in the lawsuit and opposed John Hancock's dispositive motions. Neither Otis nor American Casualty is a party to this appeal.

[2]     John Hancock also moved for summary adjudication on the products liability cause of action, but Garcia dismissed that claim.

the allegedly ADA-noncompliant Elevator No. 8, and thus she was not denied access to her office or any other location in the building.

John Hancock supported its motion with Garcia's deposition testimony, her medical records, deposition testimony of her primary care physician, and records showing Elevator No. 8's inspection and permit history, among other evidence.

In opposition, Garcia argued she had standing to pursue her claim under the Disabled Persons Act because her asthma and diabetes "affected her ability to walk, breathe, and thus access [the] subject elevator that misleveled at the time of the incident." Garcia relied on her deposition testimony and that of her primary care physician regarding the nature of her disability. Garcia also submitted declarations from engineers Joseph Stabler and Paul Kayfetz, each of whom opined that surveillance footage of Garcia's fall revealed the elevator was misleveled at the time she fell.

In January 2023, after a hearing, the court granted John Hancock's motion, concluding Garcia lacked standing to pursue damages under the Disabled Persons Act because she had not raised a triable issue that she was denied equal access to the building due to her disability. The court assumed for purposes of the motion that the elevator was not level when Garcia entered it and that Garcia suffered from asthma and diabetes. Even so, the court concluded, Garcia provided no evidence her disability prevented her from accessing the building. The court explained, "individuals *without* diabetes or asthma would *equally* be likely to encounter the alleged violation here (i.e., the mis-leveled elevator) and injure themselves."

5

D.    *Motion for Summary Judgment on Premises Liability and Negligence Claims*

In February 2024, John Hancock moved for summary judgment on Garcia's remaining causes of action for premises liability and negligence.  John Hancock conceded it was a common carrier as the owner of the elevator and thus owed a heightened duty of care to Garcia.  Even so, John Hancock argued Garcia's claims had no merit because it did not have notice of the alleged dangerous condition (i.e., a misleveled elevator) and thus did not breach that duty.  John Hancock asserted there was no evidence suggesting it had actual or constructive knowledge of a leveling issue with the elevator before Garcia fell.

To demonstrate it did not have constructive notice, John Hancock pointed to evidence of five systems it had instituted to ensure building patrons could be safely carried on its elevators: (1) regular City inspections and permit approvals for the elevators, including an inspection and approval within the last six months that showed no safety issues or code violations; (2) regular maintenance of its elevators by Otis; (3) an inspection conducted by a third-party consultant, H.H. Angus, as to Otis's maintenance of the elevators; (4) cleaning of the elevators three times a day by the building's janitorial staff; and (5) a complaint program that allowed reports of concerns or issues relating to the elevators.  John Hancock emphasized that, with these systems in effect, it was not aware of any situation in which Elevator No. 8 failed to level correctly between a misleveling incident in 2012 and Garcia's fall more than seven years later.

John Hancock supported its motion with elevator inspection reports and deposition testimony of Garcia, building manager Norma Madrid, mechanic Clark, and the City's "person

6

most qualified" on elevator inspections, Luis Figueroa. John Hancock also provided a declaration from Otis field manager Aaron Harju regarding the maintenance and service of Elevator No. 8. Harju stated that, in the five and a half years before Garcia's fall, Otis performed regular, routine, and preventative maintenance on the elevator. Three and a half weeks before Garcia's fall, Otis performed four hours of general maintenance during which an Otis mechanic observed the quality of the elevator ride, car leveling, stopping accuracy, and door operation. During the same five-and-a-half-year period, Otis did not receive notice of or observe any similar accidents or complaints of injury involving Elevator No. 8, nor did its maintenance records contain any indication of a defect that would affect the elevator's leveling.

In opposition, Garcia argued there were triable issues of material fact regarding whether John Hancock breached the heightened duty of care it owed to her. Garcia asserted there was evidence that John Hancock was on notice of the dangerous condition of Elevator No. 8 because, in July 2012, the elevator failed to level correctly in the lobby with a height differential of four inches. She also argued that notice was imputed to John Hancock because it *created* the dangerous condition by (1) failing to disable an "advance pre-opening" feature on the Elevator No. 8 that allowed the elevator doors to open before the elevator car was level with the floor, and (2) failing to ensure Otis performed the minimum necessary maintenance on the elevator per the parties' elevator maintenance agreement. Garcia pointed out that Elevator No. 8 was the only one of the building's 10 passenger elevators that had the advanced pre-opening feature enabled at the time of her fall. Garcia proffered City elevator inspector Larry Isidro's testimony that use of the feature

7

poses risk because it allows the elevator doors to open before the elevator is level, that use of the feature on only the one elevator was "abnormal," and that elevators installed after 1998 cannot by law have such a feature.  As for Otis's maintenance, Garcia relied on evidence that Otis's contract with John Hancock required it to provide a minimum of six hours of monthly maintenance on each elevator but, in the year before Garcia's fall, maintenance history reports showed Otis performed less maintenance on Elevator No. 8 than was contractually required.

The court granted John Hancock's motion, concluding Garcia failed to create a triable issue that John Hancock had notice of a dangerous condition.  Most pertinently, the court rejected Garcia's argument that John Hancock created the dangerous condition on Elevator No. 8 by failing to disable its advanced pre-opening feature.  The court determined "the mere existence of this feature being enabled—as it was lawfully allowed to be [because of its pre-1998 installation]—without more is insufficient to raise a triable issue of material fact regarding a breach of a duty of care."  The court concluded there was no evidence showing this feature was the cause of any misleveling, emphasizing the long stretch of time with no misleveling incidents despite the feature being enabled.

The court entered judgment in John Hancock's favor. Garcia appealed.

## DISCUSSION

A.    *Standard of Review*

" 'A motion for summary judgment or summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' "  (*Campbell v. FPI Management, Inc.* (2024)

8

98 Cal.App.5th 1151, 1161 (*Campbell*); see Code Civ. Proc., § 437c, subds. (c) & (f); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)  "A defendant may bring a motion [for summary judgment or summary adjudication] on the ground the plaintiff cannot prove one of the required elements of the case or there is a complete defense to the action." *(Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 702; see Code Civ. Proc., § 437c, subds. (o)(1), (2) & (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)  "To carry its initial burden when the motion is directed to the plaintiff's case rather than an affirmative defense, a defendant must present evidence that either 'conclusively negate[s] an element of the plaintiff's cause of action' or 'show[s] that the plaintiff does not possess, and cannot reasonably obtain,' evidence necessary to establish at least one element of the cause of action."  (*Luebke*, at p. 702.)  "Only after the defendant carries that initial burden does the burden shift to the plaintiff 'to show that a triable issue of one or more material facts exists as to the cause of action ....' "  (*Id.* at pp. 702-703; see Code Civ. Proc., § 437c, subd. (p)(2).)

We review summary judgment and summary adjudication rulings de novo.  (*Campbell, supra*, 98 Cal.App.5th at p. 1161; accord, *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.)  We " 'liberally construe the evidence in support of the party opposing summary judgment [or summary adjudication] and resolve doubts concerning the evidence in favor of that party.' "  (*Gonzalez*, at p. 39; accord, *Campbell*, at p. 1161.)

B.    *The Trial Court Properly Granted Summary Adjudication in Favor of John Hancock on Garcia's Disabled Persons Act Claim*

1.    *Applicable law*

The Disabled Persons Act provides that individuals with disabilities "shall be entitled to full and equal access" to "places of public accommodation ... and other places to which the general public is invited." (Civ. Code, § 54.1, subd. (a)(1); see *Jankey v. Lee* (2012) 55 Cal.4th 1038, 1044-1045 [the Act "generally guarantees people with disabilities equal rights of access 'to public places, buildings, facilities and services, as well as common carriers, housing and places of public accommodation' "].) "Full and equal access," in this context, means access meeting the standards of the ADA, any related federal regulations, and any state law prescribing even higher standards. (Civ. Code, § 54.1, subd. (a)(3); see also *id.*, subd. (d) [a violation of the right of an individual under the ADA constitutes a violation of the Disabled Persons Act]; accord, *Baskin v. Hughes Realty, Inc.* (2018) 25 Cal.App.5th 184, 192.) " 'Access' refers not only to entry into a building but, more broadly, to the use of all facilities made available for general public use, such as restrooms, parking, and fixtures within a building." (*Urhausen v. Longs Drug Stores California, Inc.* (2007) 155 Cal.App.4th 254, 261 (*Urhausen*).)

Any person, firm, or corporation who denies full and equal access to or otherwise interferes with the rights of a disabled person under the Disabled Persons Act is liable for actual damages, punitive damages from $1,000 to three times the actual damages, and attorney's fees. (Civ. Code, § 54.3, subd. (a).) To recover damages under the Act, an individual must establish that he or she was "actually denied equal access to a public place."

10

(*Reycraft v. Lee* (2009) 177 Cal.App.4th 1211, 1219; see *Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 183.)  To satisfy this "standing" requirement, the plaintiff must show that "he or she actually presented himself or herself to a business or public place with the intent of purchasing its products or utilizing its services in the manner in which those products and/or services are typically offered to the public and was actually denied equal access on a particular occasion."  (*Reycraft*, at p. 1224.)

The Disabled Persons Act only protects persons "denied access to some public site or service due to their disability." (*Turner v. Assn. of Am. Med. Colleges* (2008) 167 Cal.App.4th 1401, 1412.)  The purpose of Civil Code section 54.3 is to provide a damages remedy to persons who have been denied the same access to public facilities as persons without a disability. (*Urhausen*, *supra*, 155 Cal.App.4th at p. 264.)

      2.    *No triable issue exists that Garcia was denied access to the building due to her disabilities*

John Hancock does not dispute Garcia's asthma and diabetes were qualifying disabilities under the Disabled Persons Act but argues Garcia failed to demonstrate a genuine factual dispute existed that those disabilities affected her ability to access the building.  Accordingly, John Hancock argues, she has not raised a triable issue that she was denied equal access due to her disability.  (See *Turner v. Assn. of Am. Med. Colleges*, *supra*, 167 Cal.App.4th at p. 1412 [disabled persons must have been denied access "due to their disability"].)

John Hanock proffered evidence that prior to her fall, Garcia walked well without any assistive devices and never reported any falls or ambulating difficulties to her physician because of her asthma or diabetes.  While Garcia had a

11

permanent disabled person parking placard from the California Department of Motor Vehicles for her asthma, she voluntarily refrained from using it to park in the structure underneath the building. On the morning of her fall, although Garcia testified she felt "some mild fatigue" due to her asthma after walking the one and a half blocks from the bus to the building, Garcia proceeded to walk normally into the building, following the same path that she always did, while carrying multiple items. John Hancock's evidence was sufficient to shift the burden to Garcia.

Garcia asserts the uneven flooring between Elevator No. 8 and the lobby was a "more treacherous obstacle to navigate" for her than for able-bodied persons, and thus she did not have equal access to the building. Garcia relies on her primary care physician's testimony that asthma and diabetes can affect a person's ability to walk, stand, and breathe. But the physician did not testify about the circumstances surrounding Garcia's fall, or even specifically about Garcia's disability. On that topic, Garcia testified that her asthma only made it difficult to walk long distances when she was having a "really bad attack of asthma," usually triggered by a weather change or pollen in the air, and that her diabetes made her tired and caused her to change her diet but did not otherwise affect her daily activities. Garcia did not proffer any evidence that she was suffering an asthma attack or feeling any symptoms relating to her diabetes when she fell. She did not present evidence to suggest her fatigue or any other conditions related to her asthma or diabetes caused her to trip and fall. Even assuming Elevator No. 8 was not properly level that morning and thus was not ADA-compliant, Garcia failed to raise a triable issue that she was prevented from accessing the elevator *because of her disability*.

In addition, as John Hancock argues, Garcia admitted Elevator No. 8 was not the only elevator she could use to access her office on the 17th floor; there were at least two others. Garcia had used the building's elevators "hundreds of times" uneventfully before her fall, and she presented no evidence suggesting these other elevators were not ADA-compliant. Thus, even if Garcia had proffered evidence to show she had a disability that affected her ability to take Elevator No. 8 on the morning of her fall due to a leveling issue with the elevator, she was not denied "equal access" to the building because she could have used one of the other elevators. (See *Urhausen, supra,* 155 Cal.App.4th at p. 264 [disabled patron not denied access to store because even if she could not safely access store by one means, another accessible means of entry "remained available for her use"].) The Disabled Persons Act is not intended "to provide a cause of action for disabled persons who have suffered physical injury but to persons who have been denied the same access to public facilities as persons without a disability. ... '[T]he impediments to the physically handicappeds' interaction in community life is the inequity which [the Act] ... seek[s] to prevent.' " (*Ibid.*, fn. omitted.)

Because Garcia failed to raise a triable issue of fact that she was denied equal access due to her disability, the trial court properly granted summary adjudication on the cause of action under the Disabled Persons Act.

13

C.    *The Trial Court Erred in Granting Summary Judgment in Favor of John Hancock on Garcia's Premises Liability and Negligence Claims*

     1.    *Applicable law*

"The elements of a negligence claim and a premises liability claim are the same: a legal duty of care, breach of that duty, and proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.)[3] Every person owes a duty of ordinary care that a reasonable, prudent person would use considering all the circumstances. (*Agustin v. Golden Empire Transit Dist.* (2025) 116 Cal.App.5th 426, 438; accord, *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016.) "Carriers of persons for reward," however, "have long been subject to a heightened duty of care." (*Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1128.) These "common carriers" instead "must use the utmost care and diligence for ... safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." (Civ. Code, § 2100; accord, *Gomez*, at p. 1130.) This heightened duty of care does not make common carriers "insurers or render them strictly liable for all injuries," but it does require they " 'do all that human care, vigilance, and foresight reasonably can do under the circumstances,' albeit 'consistent with the character and mode of conveyance adopted and the practical operation of [their] business.' " (*Smith v. Magic Mountain LLC* (2024) 106 Cal.App.5th 1128, 1136 (*Smith*).) The parties agree John

---

[3]    Garcia does not distinguish between her premises liability and negligence claims or otherwise suggest John Hancock is liable for negligence beyond the premises liability allegations. Thus, we will consider the claims together.

14

Hancock owed this heightened duty of care as the owner of the elevator.  (See *Gomez*, at p. 1131; *Champagne v. A. Hamburger & Sons* (1915) 169 Cal. 683, 690-691; *Smith*, at p. 1136.)

With respect to a breach of this duty—the disputed element here—a commercial property owner may be liable for harm caused by a dangerous condition if the owner had actual or constructive knowledge of the condition or the owner could have discovered the condition by the exercise of ordinary care and should have realized that the condition involved an unreasonable risk to invitees.  (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205-1206; *Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1208.) "The plaintiff need not show actual knowledge where evidence suggests that the dangerous condition was present for a sufficient period of time to charge the owner with constructive knowledge." (*Ortega*, at p. 1206.)  "Typically, to charge an individual with constructive notice, he must have, 'actual notice of facts or circumstances which are sufficient to put a prudent person on inquiry as to the existence of the fact with respect to which he is charged with constructive notice.' [Citation.]  Therefore, a landowner cannot be charged with constructive notice without a showing of some overt feature surrounding the dangerous condition, which would notify the landowner of its existence." (*Jones*, at p. 1209.)

"Where the dangerous or defective condition of the property which causes the injury has been created by reason of the negligence of the owner of the property or his employee acting within the scope of the employment, the owner of the property cannot be permitted to assert that he had no notice or knowledge of the defective or dangerous condition in an action by an invitee for injuries suffered by reason of the dangerous condition.  Under

15

such circumstances knowledge thereof is imputed to him." (*Hatfield v. Levy Bros.* (1941) 18 Cal.2d 798, 806; accord, *Getchell v. Rogers Jewelry* (2012) 203 Cal.App.4th 381, 385 [where " 'the evidence is such that a reasonable inference can be drawn that the condition was created by employees of the [defendant], then [the defendant] is charged with notice of the dangerous condition' "]; *Oldham v. Atchison, T. & S.F. Ry. Co.* (1948) 85 Cal.App.2d 214, 218-219 [same].)

  2. *A triable issue remains as to whether John Hancock created a dangerous condition*

  To show it did not have actual knowledge of any dangerous condition with respect to Elevator No. 8, John Hancock pointed to testimony of its building manager that she had not received any report or indication that the elevator was not working properly before Garcia's fall. Other evidence showed the City had inspected the elevator and approved it for operation six months earlier, and less than a month earlier Otis had performed general maintenance on the elevator and found no issues.

  As for constructive notice, John Hancock emphasized that, at the time of Garcia's fall, it had several systems in place regarding the maintenance and operation of the building's elevators that were designed to ensure building patrons could be safely carried on its elevators. First, the elevators were regularly inspected by the City. During these inspections, the City evaluated the stopping accuracy of the elevators, whether the elevators became substantially level within the landing zone, and whether the power opening feature of the elevators was working properly. The City inspected Elevator No. 8 in 2015, 2017, and 2019. Finding no safety issues or legal violations, the City issued a permit allowing for the elevator's continued operation after

16

each inspection.  The latest permit was issued in September 2019, less than six months before Garcia's fall, and was valid until February 2021.

Second, John Hancock retained Otis to perform all maintenance on the building's elevators.  An Otis mechanic was physically at the building two days a week from 8:00 a.m. to 5:00 p.m.  As a part of their responsibilities, Otis mechanics cleaned and examined the elevator equipment, inspecting it for ordinary wear and tear and making any necessary repairs and replacements of worn parts.  Otis was also tasked with correcting any issues noted by City inspectors.  During each visit to an elevator, an Otis mechanic would ride the elevator from top to bottom, stopping at multiple floors and checking the overall condition of the elevator, including the leveling of the elevator car.  In February 2020, less than four weeks before Garcia's fall, Otis performed four hours of maintenance on Elevator No. 8, which consisted of observing the quality of the elevator ride, car leveling, stopping accuracy, and door operation.  In the five and a half years before the fall, Otis did not observe any accidents or receive any complaints of injury involving Elevator No. 8 similar to those alleged by Garcia.  Otis mechanic James Clark, who had worked at the building since September 2019, never observed any issues with the elevator before Garcia's fall to indicate it was not leveling properly.

Third, John Hancock retained a third party consultant, H.H. Angus, to inspect the elevators and monitor Otis's performance in maintaining the elevators.  H.H. Angus found no deficiencies upon an inspection in 2013.  Shortly after Garcia's fall, H.H. Angus conducted another inspection of the elevators

17

and determined that they were all in good condition and legally compliant.

Fourth, John Hancock retained a janitorial staff that vacuumed and wiped down the building's elevators three times a day. Plaintiff testified there was no debris, trash, or liquid in her path of travel that could have caused her to fall.

Fifth, John Hancock had a program in place for individuals to report any issues with the building's elevators. In the seven years before Garcia's fall, John Hancock did not receive a report of an issue with Elevator No. 8 not leveling correctly. As noted, Garcia testified that she had used the building's elevators "hundreds of times," including Elevator No. 8 "at least 25 to 50 times," and had never complained to John Hancock about any issues regarding the elevators.

This evidence was sufficient to meet John Hancock's initial summary judgment burden. However, Garcia proffered evidence to show a triable issue nonetheless remains whether John Hancock should be charged with notice because it created the dangerous condition by failing to disable the advanced pre-opening feature on Elevator No. 8. (See *Getchell v. Rogers Jewelry*, *supra*, 203 Cal.App.4th at p. 385 [where property owner created dangerous or defective condition, owner is charged with notice of the condition].)

It is undisputed that, at the time of Garcia's fall, Elevator No. 8 was the only elevator in the building with this feature enabled, which City inspector Isidro found "abnormal." Isidro testified that the feature comes with risk because it allows the elevator doors to open before the elevator car is level with the landing floor. He explained that elevators installed after 1998 were prohibited by law from having the feature. While

18

acknowledging it remained lawful to enable the feature in elevators like Elevator No. 8 that were installed before 1998, Isidro still considered the feature to be "unsafe."  Like Isidro, Garcia's expert engineer, Joseph Stabler, explained the feature "allows the elevator doors to open before the elevator is level with the floor" and thus carries risk of the "misleveling of an elevator upon passenger entry."  Stabler opined that disabling the feature "would have more than likely eliminated the … trip and fall hazard."

This evidence is sufficient to establish a triable issue.  John Hancock did not respond to any of these facts in the trial court.  Nor does it address any of them on appeal.  John Hancock instead asserts only that the trial court correctly determined there was no evidence showing it created a dangerous condition because it was lawful to have the advanced pre-opening feature enabled in Elevator No. 8.  While the fact that the advanced pre-opening feature was not unlawful might defeat a negligence per se theory, this fact alone does not mean that, as a matter of law, ordinary negligence cannot be proved, particularly given John Hancock's heightened duty of "utmost care and diligence."  (Civ. Code, § 2100; see *Smith*, *supra*, 106 Cal.App.5th at p. 1136 ["A common carrier's greater capability—and hence 'great[er] responsibility'—to avoid injury is what gives rise to the heightened duty of care a common carrier owes its passengers."]; *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 421 ["[A] defendant property owner's compliance with a law or safety regulation, in and of itself, does not establish that the owner has utilized due care.  The owner's compliance with applicable safety regulations, while relevant to show due care, is not dispositive, if there are other circumstances

19

requiring a higher degree of care."]; *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 901 [" 'We are mindful that even though [a defendant] complied with all applicable governmental safety regulations, this would not serve to absolve it from a charge of negligence, but just negligence *per se*, for one may act in strict conformity with the terms of such enactments and yet not exercise the amount of care which is required under the circumstances.' "].)  Even if mere inadvertence led to the advanced pre-opening feature being enabled in Elevator No. 8 while it was disabled in all the others, such a lack of attentiveness could be found to be inconsistent with John Hancock's duty as a common carrier.  (*Smith*, at p. 1137 ["common carriers must 'do all that human care, vigilance, and foresight reasonably can do under the circumstances,' albeit 'consistent with the character and mode of conveyance adopted and the practical operation of [their] business' "].)

Although John Hancock suggested during oral argument there is no evidence tying the alleged misleveling condition to the feature being enabled, the evidence proffered does not foreclose the possibility of such a connection.  As discussed, Stabler stated that disabling the feature would have more than likely eliminated such a hazard.

A triable issue of material fact thus remains regarding whether John Hancock created a dangerous condition by not disabling the advanced pre-opening feature on Elevator No. 8. Because there is a triable issue on Garcia's premises liability and negligence claims, we reverse the order granting John Hancock's motion for summary judgment.

## DISPOSITION

The judgment and order granting summary judgment on Garcia's premises liability and negligence claims are reversed.

20

The order granting summary adjudication on Garcia's Disabled Persons Act claim is affirmed.  On remand, the trial court is directed to vacate its order granting the motion for summary judgment and to enter a new order denying the motion.  The parties shall bear their own costs on appeal.


                                        STONE, J.

We concur:


        MARTINEZ, P. J.


        GIZA, J.*

---

*        Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.